# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,        Criminal No. 19-20168

                Plaintiff,        Honorable Paul D. Borman

vs.

CONSTANTINE XETHALIS,

                Defendant.

_____/

# RESPONSE AND OPPOSITION TO
# MOTION FOR COMPASSIONATE RELEASE

## INTRODUCTION

Constantine Xethalis is serving a 40-month sentence for transporting ten pounds of methamphetamine into the United States from Canada at the Blue Water Bridge.   His criminal history in Canada spans three decades, and involves multiple events of drug trafficking, possession with intent to distribute, and simple drug possession.   Xethalis is a 52 year old, type 1 diabetic who seeks immediate release from prison based on COVID-19.   Xethalis is housed at a federal medical center where he is under constant medical supervision, and where there are currently zero positive cases among inmates.   His medical condition does not provide extraordinary and compelling reasons for his immediate release.   In addition, the

1

§3553(a) factors counsel in favor of his continued incarceration.   His motion should be denied.

## **BACKGROUND**

Xethalis is a Canadian citizen with no ties to the United States who resided in Montreal prior to his arrest.   As this Court aptly noted at sentencing, Xethalis amassed "a few decades' worth" of prior convictions.   ECF No. 20, PageID.90. This case stems from CBP's seizure of approximately ten pounds of methamphetamine pills from Xethalis at the Blue Water Bridge, as Xethalis attempted to enter the United States on March 13, 2019.

On March 28, 2019, the grand jury indicted Xethalis for possession with intent to distribute a controlled substance.   Given the drug quantity and type, Xethalis faced a 10-year mandatory minimum sentence unless he qualified for the safety valve.   Xethalis pleaded guilty on May 15, 2019.   In October 2019, this Court determined that Xethalis qualified for the safety valve and sentenced him to 40 months in custody, which was well-below his guideline range of 70 to 87 months. He did not appeal.

Xethalis is now 52 years old and incarcerated at Federal Medical Center (FMC) Devens.   He is a type 1 diabetic.   His expected release date is in January 2022.   Although he is subject to a 5-year term of supervised release, in reality, there

will be no supervision because he will be returned to Canada when he leaves federal custody.

Xethalis filed a pro se motion for compassionate release on July 23, 2020. The United States was ordered to respond on or before August 14, 2020, and did so. Xethalis then filed a second pro se motion in late August 2020. Counsel was appointed to represent Xethalis, and on November 25, 2020, counsel filed a new (third) motion for compassionate release on Xethalis' behalf.

## ARGUMENT

### I.    The United States Does Not Contest that Xethalis Has Exhausted His Administrative Remedies.

Absent a specific statutory exception, the district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is one of the limited exceptions permitting a sentence modification. It includes an exhaustion requirement.   The United States does not contest that Xethalis has satisfied Section 3582(c)(1)(A)'s exhaustion requirement.

### II.   Xethalis Has Not Met the Narrow Requirements for Compassionate Release on the Merits.

Even if Xethalis has exhausted his administrative remedies, compassionate release would still be improper.   It is an extreme remedy that allows a sentencing court to modify an inmate's sentence only for "extraordinary and compelling

reasons," which the inmate has the burden of showing. 18 U.S.C. §3582(c)(1)(A); *see also United States v. Collins*, No. 17-20360 (E.D. Mich. May 7, 2020) (Lawson, J.).

The compassionate release statute has identified three substantive requirements for granting relief. *United States v. Ruffin*, 978 F.3d 1000, 1004-05 (6th Cir. 2020) (citing 18 U.S.C. § 3582(c)(1)(A)). Before reducing a sentence, the court must (i) find that extraordinary and compelling reasons warrant such a reduction; (ii) find that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission; and (iii) consider the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable. *Id.* (citing § 3582(c)(1)(A)(i)).

## A. Xethalis Has Not Provided Extraordinary and Compelling Reasons for this Court to Grant his Compassionate Release.

"The COVID-19 pandemic, by itself, does not qualify as the type of inmate-specific medical condition authorizing compassionate release." *United States v. Buttrom*, No. 16-CR-20645, 2020 WL 4016074, at *2 (E.D. Mich. July 16, 2020) (Borman, J.). The BOP has worked diligently to implement precautionary measures reducing the risk from COVID-19 to inmates. *See Wilson v. Williams*, 961 F.3d 829, 841 (6th Cir. 2020) (agreeing with the BOP that "it has responded reasonably to the risk posed by COVID-19"); *United States v. Schamante*, No. 13-CR-20764, 2020 WL 4366066, at *4 (E.D. Mich. Jul. 30, 2020) (Borman, J.) ("The

BOP has in fact put in place and updated its protocols to address the novel risks from COVID-19;" *citing Wilson*).

FMC Devens is effectively managing COVID-19 within its facility. In *Grinis v. Spaulding*, No. 20 Civ. 10738, 2020 WL 2300313 (D. Mass. May 8, 2020), FMC Devens inmates brought a class action seeking an order to release sufficient number of inmates to ensure effective social distancing.  2020 WL 2300313, at *1.  The court denied plaintiffs' motion for preliminary injunction, noting extensive measures taken at FMC Devens to address the risks posed by COVID-19.  *Id.* at *3.  The case was eventually dismissed.  Likewise, in *United States v. Farmer*, No. 1:16CR203, 2020 WL 4057550, at *3 (N.D. Ohio Jul. 20, 2020), another court considering compassionate release for another FMC Devens inmate observed that "it does not appear that the conditions at FMC Devens present a substantial risk to its inmate population" when, at the time of the decision, there were just 7 positive cases out of 919 inmates cases, and 2 fatalities.  The inmate in *Farmer* suffered from hypertension, diabetes and end-stage renal disease requiring dialysis.  The numbers at FMC Devens have only improved since the *Farmer* decision was issued in July.  As of December 9, 2020, there are zero active, positive cases among inmates, and no additional fatalities. https://www.bop.gov/coronavirus/ Covid 19 Cases (last visited December 9, 2020).

Xethalis' argument that given his existing medical condition, the enhanced risk posed by COVID-19 constitutes an "extraordinary and compelling reason" to release him, was recently considered, and rejected, by the United States District Court for the Southern District of New York, in the case of *United States v. Cabrera*, No. 05 CR. 1278-2 (NRB), 2020 WL 4226637, at *1 (S.D.N.Y. Jul. 23, 2020). Cabrera is also an inmate at FMC Devens. He has a considerably riskier medical profile than Xethalis, with CDC COVID-19 risk factors of stage 4 chronic kidney disease, type 2 diabetes and obesity. *Id*. In denying Cabrera's motion for compassionate release, the court recognized the significance of a housing assignment at a medical facility instead of a regular prison. Because the defendant was "currently incarcerated in FMC Devens, which is not a regular prison but a medical facility," the medical risks the defendant faced "are significantly mitigated by his designation to a medical facility." *Id*. The same holds true for Xethalis.

Xethalis is a type 1 diabetic. Xethalis' claim that being diabetic means that he is "especially prone to contracting Coronavirus Disease (Covid-19)" (ECF No. 31, PageID.186) is made without any support and is patently false – his medical condition "does not make him more susceptible to contracting the virus." *United States v. Shah*, No. 17-20467, 2020 WL 4674123, at *4 (E.D. Mich. Aug. 4, 2020) (Lawson, J.). To be sure, type 1 diabetics are not even on the CDC list of people who are at increased risk of severe illness from COVID-19, should they contract it.

Rather, type 1 diabetics "might" be at increased risk.   *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.[1]

Xethalis resides in an open housing unit at FMC Devens and is completely independent with his activities of daily living.   ECF No. 31-10, PageID.245.   He has requested and received copies of his medical records on multiple occasions from the BOP staff (s*ee* ECF No. 23-4, PageID.138-141; Exhibit A, 39, 75-76),   but has included just a handful of pages of records in his various court submissions. Because his full BOP medical records now exceed 500 pages, the United States has included those most relevant in connection with the instant filing, under seal at Exhibit A.   The full records are available to the Court upon request.

These records demonstrate that Xethalis has received constant support for his diabetic condition at FMC Devens.   After working together with his medical team, even Xethalis agreed just this week that his diabetes has been "very well controlled recently."   Exhibit A, 1.   Xethalis was supplied a self-carry glucometer upon his arrival at the facility, as well as glucose tablets.   *Id.*, 61, 93, 94, 97.   To additionally help prevent hypoglycemic events, his doctor ordered that he be given special

---

[1] Xethalis may also sometimes experience hypertension, although medical records confirm that his "HTN" is in "excellent control."   Exhibit A, 96.   Hypertension is in the CDC's same "might" category as type 1 diabetes for COVID-19 risk.   He has had several blood pressure readings within normal range during his routine checkups.   *Id.*, 11 (112/58 on October 29); 23 (107/63 on September 30).

snacks, such as meat and cheese sandwiches with fruit, and sometimes peanut butter and jelly.  *Id.*, 20, 62, 95.  He has met with the dietitian for nutrition counseling and education at least twice.  *Id.*, 28, 87.  Given that diabetics sometimes require medical shoes or have vision issues, Xethalis received a "routine diabetic foot screen" and an eye exam.  *Id.*, 9, 15.

Unfortunately for diabetics, sometimes hypoglycemic events happen.  FMC Devens has a hypoglycemic reaction protocol in place to care for its diabetic inmates, with varying levels of physician approved protocols depending on the severity of the event.  *Id.*, 69, 72-73.  Nurses typically complete a standard form titled "Nursing Intervention for Hypoglycemic Reaction" when care is provided.  *Id*. These standardized procedures enable the FMC Devens medical professionals to react immediately and effectively when inmates need urgent assistance.

A nurse intervened quickly to assist Xethalis with a hypoglycemic event under this protocol in mid-November.  He references this event in the letters submitted in support of his brief, but the medical records seem to provide a more plainspoken account of what occurred, for Xethalis was not determined to be in a coma, as he claimed, nor had he been experiencing "2 and 3 ceasures everyday," as his mother contends.  ECF No. 31-14, PageID.268; ECF No, 31-13, PageID.267.  Rather, Xethalis' medical records show that an emergency call occurred on the morning of November 11, 2020 on Xethalis' housing unit. Exhibit A, 5.  According to the

records, Xethalis awoke in the middle of the night and felt that his sugar was very low.   He was able to reach to get his glucose and took the last tablet in his bottle, but was unable to get to his locker where he had an additional bottle of glucose tablets.   Correctional officers found him and made an emergency call.   By Xethalis' own account, the nurse arrived "within 5 minutes" and administered a glucose tablet.   ECF No. 31-14, PageID.269.   The Nursing Intervention for Hypoglycemic Reaction form documenting this event placed Xethalis at the most desirable level of "alert and able to swallow."   Exhibit A, 69.   The "physician approved protocol" for someone at this level was to "give fast acting carbohydrates." *Id*.   Boxes were checked for cranberry/apple juice, 4 glucose tabs, and check his blood glucose every 10-15 minutes.   *Id*.   Xethalis did not require any of the more serious treatments in the protocol, such as intravenous treatment or an intramuscular injection, and the disposition was for him to "return to quarters."   *Id*.

On November 12, Xethalis' doctor met with Xethalis for a follow up appointment.   Xethalis was on the job at food services at the time.   *Id.*, 5.   Dr. Ruze observed that Xethalis appeared "well, energetic, articulate -- was doing lifting on loading dock when I arrived."   *Id*.   Xethalis informed that "the main issue is that he is very physically active at work, and is very stressed about his job in food service where he is working 12 hours every other day," because he "likes his job but feels that he can not manage 12 hour shifts and maintain sugar control."   *Id*.   The doctor

9

tried to work with the Food Service Administrator to figure out a part time schedule for Xethalis.   When this was not feasible, the doctor determined that "it would be better for him to work 6 hours daily every day for better consistency in sugars. I will place him on a sedentary work restriction and communicate with his unit counselor. I will also decrease his Lantus to 10 units daily."   *Id.*

Management of stress from various triggers and the food service work assignment were repeat issues for Xethalis.   On October 29, 2020, Xethalis told his medical care provider that "he has been stressed lately with his compassionate release paper work and the fact that he is being assigned tasks at this [food services] job that require him to focus," and that he is "very stressed doing this particular job and experiences hypoglycemic episodes in the middle of his work day."   *Id.*, 11. Xethalis made like complaints about his work in food services on July 22:   "He reports some hypoglycemic episodes, typically in the mid-morning if he is exercising a lot or working in the kitchen." *Id.*, 83.

Since Dr. Ruze removed Xethalis from the food services work assignment on November 12, Xethalis' blood sugar has been well controlled, save for one event on December 7, when Xethalis did not follow standard diabetic protocol and eat something following his noon insulin dose.   The medical team responded quickly and provided intravenous glucose.   *Id.*, 1.   Importantly, Xethalis himself attributed the low blood sugar to his own failure to eat lunch after receiving his noon dose of

insulin, and admitted that his blood glucose levels otherwise "have been very well controlled recently[.]" *Id.* The medical notes confirm that "[h]is BGL has been well controlled aside from this one instance, will continue insulin doses as ordered. Patient educated to ensure he eats something after receiving insulin to avoid future lows. He was discharged back to his housing unit." *Id.*, 4.

Xethalis has failed to follow medical advice on a few other occasions. Records from a September 30, 2020 medical encounter show that "Occasionally, he reports that he does not show up for his blood sugar tests due to long pill lines." *Id.*, 22. Xethalis was only in "partial compliance" with his insulin regimen in July. *Id.*, 86. On some occasions, records reflect that Xethalis has refused his insulin. *Id.*, 47, 49, 52.

During his follow-up or chronic care clinic medical appointments, he has appeared well to his caregivers. On November 12, he appeared "well, energetic, articulate -- was doing lifting on loading dock when" the doctor arrived. *Id.*, 5. At an October 29 appointment that Xethalis requested, (*id.*, 70) he appeared "Well, Alert and Oriented x 3." *Id.*, 12. The same was true at medical encounters on September 10 and September 2. *Id.*, 36, 41. At his July 22 evaluation, Xethalis denied "fever, chills, headache, dizziness, difficulty breathing, chest pain, abdominal pain, nausea, vomiting, diarrhea, constipation," and was in no pain. *Id.*, 83. He was described as "alert and oriented x3, ambulatory without difficulty, resting

comfortably in the chair during interview, skin warm/dry/intact, breathing normal/unlabored, talking in full sentences, no apparent distress at this time." *Id.*

On May 4, 2020, Xethalis was seen by a registered dietician "for nutrition consult regarding Type 1 Diabetes." *Id.*, 87. He had a second nutrition education session with her in September. *Id.*, 28. Xethalis was "receiving two snacks a day, sandwich in the am and pm," which "help prevent hypoglycemic events." *Id.*, 87. These snacks have been extended through October 2021. *Id.*, 62. Xethalis and the dietitian "discussed prioritizing protein and vegetable choices and monitoring carbohydrate intake," as well as "commissary items that may be beneficial for blood sugar management and importance of keeping fast-acting sugar (i.e glucose tablets, juice etc) on hand in case of hypoglycemia." *Id.*, 87. The dietitian also noted that: "*Hypoglycemic events per inmate report and review of blood glucose log most commonly occur after meal time insulin dose, before eating a meal. Discussed with inmate that this is the appropriate time to have a snack*. Inmate reports waiting until low (<70) before eating a snack; *discussed being more proactive*, i.e eating when first feeling hungry *rather than waiting*, inmate agreeable." *Id.*, 88 (emphasis supplied). Had Xethalis followed her advice, he might have avoided the unfortunate event of December 7.

Xethalis saw Dr. Ruze on May 1, 2020 because the doctor "asked to see him to follow up on his sugar control" after their initial appointment on March 19. *Id.*,

90.   The doctor noted that Xethalis "generally feels well and is generally doing fine."   *Id*.   They discussed changes to his snack schedule to help manage his blood sugar.   *Id*.

Records also show that Xethalis' hemoglobin A1c levels have improved since he arrived at FMC Devens.   He cites a March 18, 2020 test with a hemoglobin level of 9.5.   ECF No. 31-8, PageID.241.   But his November 4, 2020 test shows an improved level of 7.7. Exhibit A, 63.   His goal is to be under 7 (*id.*, 30), and he appears to be on his way.

Xethalis claims that his medical condition has deteriorated while he has been serving his sentence.   But even he admits that his blood glucose levels had "been very well controlled recently," so long as he follows the rudimentary guidance to eat following an insulin dose.   *Id.*, 1.   And he has not offered any records to corroborate his statement that he had his condition under good control before his arrest.   Information obtained through the course of the investigation sheds some light on Xethalis' previous lifestyle and diet.   Xethalis has informed that he obtained the methamphetamine from an unknown woman at a McDonald's in Montreal.   ECF No. 20, PageID.97.   When asked how this stranger knew to find him at the McDonald's without a prior agreement to meet up, he explained that he ate there all the time, and it was a likely place to find him.   Reliance on fast food to help control blood sugar is questionable at best.   To be sure, at his Presentence

interview, Xethalis informed that his type 1 diabetes "is very uncontrolled and that he is prescribed medications that he administers four times per day."   PSR at ¶52. Now, Xethalis asks us to take him at his word that his condition was better before. But he has already provided false information to the warden at least once.   In his first request to the warden for a reduction in sentence, he stated that if released, "I have a home with a wife." ECF 31-6, PageID.239.   Xethalis was unmarried at the time of his sentencing in October 2019, had no domestic partner, and has been in custody since his arrest.   *See* PSR at ¶47.   His current motion makes no mention of a wife. Xethalis' willingness to provide false information to support his release effort is of legitimate concern.

Xethalis has not established an extraordinary and compelling medical reason to be released from prison and returned to Canada.   A FMC Devens nurse responded to his November 11 hypoglycemic event in less than five minutes.   It is hard to imagine that he could achieve faster care than that elsewhere.   And his blood glucose levels have been in very good control in recent weeks -- when he follows the dietary advice that he has been given.

He offers Jaquel Owens (18-20214) and Willie Brown (14-20561) as comparison cases.   They are materially different.   In each, the United States conceded that the defendant met the extraordinary and compelling test because he had confirmed CDC risk factors for COVID-19.   Xethalis does not.   In addition,

Xethalis stumbles past what is perhaps the most important difference: Xethalis will have no supervision of any kind from the Probation Department if his motion is granted.   Owens' term of supervised release includes home detention.   Brown was released under strict conditions of supervised release, to include home confinement, ZERO tolerance weekly drug testing, and prior approval and verification from the supervising Probation officer to leave the house, for medical appointments and drug testing only.   Like supervised release terms are impossible to enforce on Xethalis, who would return to Montreal upon release, far beyond the reach of any United States Probation Department.

Xethalis' mother, Colette Ranger, is not a United States Probation Officer, and she cannot provide this service.   On August 14, 2019, via email, defense counsel submitted a letter of support for sentencing from Ms. Ranger to government counsel, the Probation officer, and the Court.   The following excerpts from her letter are relevant here:

- for these past 30 years has never been in any kind of troubles with law enforcement he has been working hard

- When i heard he was arrested in the United states i was in shock and disbelieve because It's so out of character for my son to do this. I do not know how or why this all came adout or how he got involved with these people because it is not at all the kind of person he is i am still to this day in shock.

- He is also a diabetic since the age of five the highest degree of diabeties very hard to control

15

- What i do know however is that he had no choice he was forced to do this.

Ms. Ranger's letter confirms that Xethalis' type 1 diabetes was already "very hard to control" long before he was arrested; that she was oblivious to all of the criminal activity he had engaged in for many decades, including periods of incarceration; and that she believes that he was "forced" to commit the instant crime. It comes as no surprise that she cannot view her son objectively; few mothers of federally convicted felons can.  But with all respect, her correspondence to the Court demonstrates that she does not have adequate control over her son, or a sufficiently realistic understanding of his lifestyle and choices, to provide the substitute supervision that Xethalis proposes in his current brief.  Frankly, his suggestion that she "is in a far better position to monitor his activities than any federal agency, no matter the latter's good intentions" (ECF No. 31, PageID.201) is an insult to the Probation Department, not to mention utterly ludicrous.   Xethalis' proposed release plan is unfettered freedom, and it should be rejected out of hand, as it was when he first proposed it at sentencing.

**B.    The §3553(a) Factors Strongly Weigh Against Xethalis' Release.**

Even when an inmate is statutorily eligible for a sentence modification based on "extraordinary and compelling reasons," compassionate release is not automatic. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C.§3553(a) and determine that release is still appropriate. 18 U.S.C.

16

§3582(c)(1)(A). Here, as at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. §3553(a).

This Court discussed the relevant §3553(a) factors during the sentencing hearing, and determined that they supported a 40-month custodial sentence:

> [T]he nature and circumstances of the offense are serious. The history and characteristics of the defendant, while they may not score under the sentencing guidelines here, they do indicate and defendant's counsel as well concedes that he has been involved in criminal activity for a period of time.
>
> There's a need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment and afford adequate deterrence to criminal conduct. And given the recent conviction based on conduct that occurred in the year of 2019, which we're still in, that there may as well -- there is a need to protect the public from further crimes of the defendant.

ECF No. 97, PageID.103-104.   In response to concerns about Xethalis' health, the Court explained that it would recommend designation at a federal medical center prison, but also made clear that "I have considered home confinement and I do not feel that it is appropriate in this serious case."   ECF No. 97, PageID.104.   These factors apply with equal force today.   The specific factors are addressed more fully below.

**"[T]he nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).**

Xethalis brazenly ignored the laws of both the United States and Canada that prohibit drug trafficking when he served as a cross-country drug courier.   He also possessed ecstasy and cocaine for his personal use.

While this case marks Xethalis' first conviction in the United States, his criminal history in Canada is extremely concerning.   He has convictions for robbery and use of a firearm in 1991, drug trafficking in 1995 and again in 1999, and drug possession in 2002.   *See* PSR at ¶30-34.   The First Step Act makes his 1995 and 1999 Canadian drug trafficking convictions ineligible predicates for §851 enhancements.   And because they are foreign convictions, not even his more recent custodial convictions count for guideline scoring purposes.   *See* USSG §4A.1.2(h).

Xethalis' family lives in Montreal, and he intends to return there following disposition of the offense.   *See id.* at ¶¶44-49.   Earlier this year, Xethalis falsely informed the warden that he had a home with a wife.   ECF 31-6, PageID.239.

In his current motion, Xethalis falsely reports to the Court that the "Government conceded his assistance by granting him consideration under United States Sentence Guideline §5.K.1.1."   This is also untrue.   Xethalis did not provide substantial assistance in the investigation and prosecution of others.   He simply sought to avail himself of the safety valve, and the statute (18 U.S.C. §3553(f))

requires him to provide information to the prosecution to be eligible for consideration.   These are not the same thing.   The United States did not file a 5K motion.   Rather, government counsel raised significant concerns that Xethalis had not been truthful, and did not support application of the safety valve benefit at sentencing. ECF No. 20, PageID.101 ("Based on what the defendant has said today, if he's still trying to blame the drugs on his co-defendant, I don't think he meets the qualifications of safety valve.").

In suggesting that he is not a danger, Xethalis virtually ignores the conduct that resulted in his current incarceration.   This greatly minimizes the severity of his conviction.   Xethalis was involved in the distribution of 10 pounds of methamphetamine.   This drug is highly dangerous.   The Sentencing Commission and Congress take it seriously, in recognition its dangers and its incredible, brutal, addictive properties.   He holds an extensive criminal history from Montreal, including robbery, drug possession and trafficking.   PSR at ¶¶29-39.   His eight prior custodial sentences apparently did not provide the necessary inspiration to keep Xethalis from returning to crime.   His type 1 diabetes did not stop him either. *See Ruffin*, 978 F.3d at 1009 (denying compassionate release where defendant "had engaged in his crimes while suffering from those conditions" and they "did not previously stop him from his criminal activity"); *United States v. Keefer*, No. 19-4148, 2020 WL 6112795, at *5 (6th Cir. Oct. 16, 2020) (affirming sentencing court's

19

denial of compassionate release even though inmate suffered from debilitating seizures, when the sentencing court was aware of inmate's medical conditions when it imposed his sentence, and imposed a sentence at the low end of the sentencing guidelines due to them); *United States v. Franklin*, No. 18-CR-20481, 2020 WL 6393875, at *3 (E.D. Mich. Nov. 2, 2020) (Borman, J.) (denying compassionate release where the Court concluded at sentencing that the offense was serious and there was a need to protect the public from further crimes of the defendant, but also recommended placement at a medical facility to provide him with medical care). Xethalis offers no suggestion as to how he will support himself upon release. He is a drug user and gambler. CBP officers also found an MDMA (ecstasy) pill and approximately 2.7 grams of cocaine in Xethalis' personal belongings, and he admitted they were his. *See* PSR at ¶12. He agreed to participate in the instant offense to settle a gambling debt.

**"[T]he need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).**

This is a "serious case" (ECF No. 20, PageID.104) involving the trafficking of 10 pounds of a frequently abused drug, methamphetamine. The ready and willing distribution of highly addictive drugs like methamphetamine guarantees that the ultimate users, who undoubtedly suffer from addiction, will have little chance to overcome their challenges.

Xethalis is a recidivist who does not respect the law. His extensive experience with the criminal justice system has clearly made no impact on his desire to refrain from continued criminal conduct. In his sentencing memorandum and his allocution, he attempted to divert blame to others, demonstrating a lack of acceptance of responsibility: "The drugs didn't belong to me. They belonged to my co-defendant at the time. It was his. It wasn't mine." ECF No. 20, PageID.96.

Just punishment is an important factor. Even Xethalis' attorney admitted that "punishment is in order." ECF No. 20, PageID.94. In a case like this, involving the transportation of a large quantity of meth into the United States at a border crossing, it is important to send a message that such conduct will not be tolerated, and that the penalties for committing such crimes are severe.

This Court rejected defendant's proposal for home confinement out of hand at the time of sentencing. ECF No. 20, PageID.104. Compassionate release is even less restrictive. Xethalis has now served about 21 months of his 40-month sentence. Xethalis' term of incarceration has not been long enough to provide sufficient just punishment. This court already granted a generous downward departure. The guideline range, even accounting for the safety valve discount, was still 70 to 87 months.

**"[T]he need for the sentence imposed . . . to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B) and (C).**

Deterrence and protection of the public remain important sentencing factors in this case.   Xethalis has been committing crimes for nearly 30 years, and served eight separate custodial sentences in Canada.   *See* PSR at ¶¶29-34; 38-39.   None of these prior terms of incarceration gave him sufficient perspective to refrain from the instant criminal activity.   Previous fines, probation, jail and prison terms for his offenses did not successfully deter Xethalis from criminal conduct. He has repeatedly demonstrated that a period of incarceration is the only way to protect the public from his crimes.

As discussed above, if Xethalis' motion is granted, he will not be subject to supervision by the Probation Department because he will be living in a foreign country. The Court acknowledged as much at sentencing.   ECF No. 20, PageID.105.   Past conduct is typically one of the best indicators of future performance.   This defendant, as the Court noted, has 30 years of criminal history. He has been incarcerated eight times.   This conviction marks the third time that he has been involved in a drug trafficking offense.   For many years, he has had diabetes that was, according to his mother, "very hard to control."   But this affliction has never stopped him from committing crimes before.   Even his defense attorney recognized that "Mr. Xethalis doesn't always think right," "He doesn't always do the

right thing," and "He does foolish things."   ECF No. 20, PageID.91, 93.   He has

not given this Court sufficient reason to believe that he will live a law-abiding life if

given the privilege of early release.

*      *      *

Thus, even if the Court were to find Xethalis eligible for compassionate

release, the §3553(a) factors, coupled with no possibility of post-release supervision,

should still disqualify him.

## III.   Xethalis' Prisoner Transfer Program Request.

Xethalis has applied for a prisoner transfer to Canada through the Department

of Justice's International Prisoner Transfer Program.   Undersigned counsel has not

opposed the transfer, and his request is currently under consideration.

<u>CONCLUSION</u>

For all of the foregoing reasons, the United States respectfully requests that

defendant's motion be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*/s Erin S. Shaw*
ERIN S. SHAW
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI   48226
(313) 226-9182

Dated: December 9, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 9, 2020, I caused this **RESPONSE AND OPPOSITION TO MOTION FOR COMPASSIONATE RELEASE** to be electronically filed with the Clerk of the United States Court for the Eastern District of Michigan using the ECF system, and that copies of this brief will be served electronically to counsel of record.

*/s Erin S. Shaw*